# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**WESTERN PENNSYLVANIA ELECTRICAL**
**EMPLOYEES PENSION TRUST,**

      **Plaintiff,**

  v.                                                  **Case No. 07C0582**

**PLEXUS CORP., et al.,**

      **Defendants.**

## DECISION AND ORDER

Lead plaintiff ("plaintiff") Western Pennsylvania Electrical Employees Pension Trust brings this putative class action alleging that defendant, Plexus Corporation ("Plexus"), a manufacturer headquartered in Neenah, Wisconsin and several of its officers ("the individual defendants") violated §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("the Act"), 15 U.S.C. §§ 78j(b) & 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff alleges that it purchased shares of Plexus common stock between January 25, 2006 and July 27, 2006 (the "class period") in reliance on defendants' misrepresentations concerning Plexus's financial condition and incurred damages as a result. Pursuant to Fed. R. Civ. P. 12(b)(6), defendants now move to dismiss plaintiff's complaint for failure to state a claim.

### I. SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff's allegations are based on its counsel's analysis of publicly available news articles and reports, securities analysts' reports and advisories about Plexus, press releases, SEC filings and other public statements issued by Plexus, and interviews with former Plexus employees. Plaintiff alleges as follows: As of the end of Plexus's 2005

fiscal year,[1] Plexus classified its end-markets into five sectors: Wireline/Networking, Wireless Infrastructure, Medical, Industrial/Commercial, and Defense/Security/Aerospace. Prior to Plexus's 2006 fiscal year, Defense/Security/Aerospace comprised only a small percentage of Plexus's overall business, between three and five percent in the three years prior. Prior to the beginning of the class period, defendants began to represent that the Defense sector was set to increase.

Throughout the class period, defendants issued materially false and misleading earnings forecasts and projections. At the start of the class period, defendants represented that they were increasingly confident that Plexus could attain full-year revenue growth of fifteen to eighteen percent and subsequently increased their estimate to approximately twenty percent for fiscal year 2006. Additionally, defendants repeatedly made positive statements about Plexus's defense business and cited it as a primary driver of the company's anticipated revenue growth.

Defendants' earnings forecasts and projections lacked a reasonable basis and were therefore materially false and misleading because defendants knew that Plexus's defense business involved a single order rather than an extended contract.[2] This fact made it less

---

[1] The complaint alleges that Plexus's fiscal year ends on the Saturday nearest to the 30th day of September. In 2005, Plexus's fiscal year ended on October 1, 2005. The first quarter of its 2006 fiscal year ended on December 31, 2005; the second quarter ended on April 1, 2006; the third quarter ended on July 1, 2006; and the fourth quarter ended on September 30, 2006.

[2] With respect to the single order, the complaint indicates as follows: the order was for three thousand units of a device designed to protect American soldiers in Iraq from Improvised Explosive Devices (IEDs). The United States government entered into a $289 million contract with General Dynamics to produce the devices. General Dynamics subcontracted with Med-Eng Systems to carry out forty-eight percent of the work, and Med-Eng Systems subcontracted a significant portion of its share to Plexus. Plexus's work on the order was winding down by June 2006 and completed in July 2006. According to one of plaintiff's confidential witnesses who was a Plexus employee at that time, Plexus expected another order for five thousand units, but the order never materialized.

likely that Plexus would attain the stated revenue and earnings projections, but defendants failed to disclose it. Defendants' positive statements about Plexus's defense business created the impression that such business was growing and obliged defendants to disclose that the defense business did not involve a long-term commitment but only one order.

Additionally, defendants' representations caused Plexus stock to rise from an initial price of $23.48 per share on January 26, 2006 to a high of $46.91 per share on May 5, 2006. During this period, the individual defendants sold significant amounts of personally-held shares. Plexus did not obtain additional defense related orders and did not achieve its anticipated revenue growth, and the price of its stock fell to $22.89 per share on July 27, 2006.

I will provide additional details concerning plaintiff's allegations in the course of the decision.

## II. APPLICABLE LEGAL STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." EEOC v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007) (citing Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007)). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." Id. (citing Twombly, 127 S. Ct. at 1965). In addition, the complaint must satisfy the heightened pleading standards provided in the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

Section 10(b) prohibits the "use . . . , in connection with the purchase or sale of any security . . . , of any manipulative or deceptive device or contrivance . . . ." Implementing § 10(b), Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made . . . not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

To satisfactorily plead a violation of Rule 10(b)(5), plaintiff must allege facts indicating that defendants (1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which it justifiably relied and (6) that the false statement or omission proximately caused damages. Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir. 2006) (Makor I), vacated and remanded on other grounds, 551 U.S. 308 (2007).

To plead a false statement of material fact, plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." Id. With respect to an omission of material fact, silence is not misleading absent a duty to speak. Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995). An issuer of stock need not disclose the hazards of its business, but the data it discloses must be accurate and sufficient to enable investors and analysts to draw conclusions about the company's condition. Wielgos v. Commw. Edison Co., 892 F.2d 509, 515 (7th Cir. 1989). A statement is material if it is likely that a reasonable purchaser or seller of a security (1) would consider it important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by the statement. Id. However, mere puffery is not actionable under Rule 10b-5. "If the

statement amounts to vague aspiration or unspecific puffery, it is not material." Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997).

Scienter involves a "mental state embracing an intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). Misstatements or omissions made recklessly are also made with scienter. To plead scienter, a complaint must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In determining whether plaintiff's allegations are adequate to give rise to a strong inference of scienter, I accept the allegations as true and consider the complaint in its entirety as well as other sources that I would ordinarily review, such as documents attached to the complaint or those subject to judicial notice. Tellabs v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). I then ask whether the allegations taken collectively establish the "strong inference." Id. In doing so, I weigh plausible nonculpable inferences against inferences favoring plaintiffs' claim. Id. at 2509-10. The inference favoring plaintiff's claim "need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences." Id. at 2510. Rather, plaintiff's complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." Id.

Finally, under the PSLRA's safe harbor provision, a defendant is not liable for forward-looking statements that are accompanied by meaningful cautionary statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i). Section 78u-5(i)(1) defines a forward-looking statement as

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; [or]

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

. . . .

To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the forward-looking statement. Asher v. Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004).

### III. DISCUSSION

I conclude that for two primary reasons, plaintiff's allegations fail to survive defendants' Rule 12(b)(6) motion: first the facts plaintiff alleges do not give rise to a strong inference of scienter; alternatively, the statements of which plaintiff complains are protected by the PSLRA's safe harbor provision. I discuss these conclusions below.

**A. Scienter**

Plaintiff contends that the following allegations support a strong inference of scienter: The individual defendants participated directly in Plexus's management and were privy to confidential information regarding Plexus. Thus, they knew that Plexus's important defense customer had only placed a single order. They further knew that this fact might adversely affect Plexus's financial future. Thus, their positive depiction of Plexus's defense business during the class period was materially false and misleading. The individual defendants were also aware of Plexus's earnings projections, knew that the cessation of a significant military program would have a harmful financial impact on Plexus and knew

that the duration of profitable defense programs could be short.  Thus, they knew that income from Plexus's defense business would decline in the second half of the 2006 fiscal year.  The individual defendants also engaged in unusual trading activity during the class period, selling off a substantial portion of their Plexus stock at artificially inflated prices when they knew that the price of Plexus stock would decline.

The above allegations fail to include facts that give rise to a strong inference of scienter.  I agree with plaintiff that defendants made positive statements about Plexus's defense business and its overall financial future.  However, I disagree that the facts that defendants did not disclose that Plexus's defense business consisted of a single order of 3000 units and that production on such order would be of limited duration give rise to a strong inference that defendants made their statements with the requisite intent to deceive, manipulate or defraud investors.  It is more plausible that defendants believed that Plexus would receive additional defense orders before or after completing work on the existing defense order.  Plaintiff alleges no facts indicating that defendants had reason to believe that Plexus would not receive additional defense orders.  In fact, plaintiff alleges that it was widely expected within Plexus that the company would receive a second defense order, one for 5000 units.

Plaintiff offers statements from confidential witnesses, but these are insufficient to create a strong inference of scienter.  Such witnesses indicate that the production work on the defense order was set to and did wind down in July 2006.  One confidential witness states that certain Plexus employees provided reports and forecasts concerning the progress of orders to, and met with, Strategic Customer Managers, who in turn met with "upper management."  (Compl. ¶¶ 48-49.)  But this suggests nothing more than that defendants were aware of the manufacturing schedule for the defense order.  It does not

suggest that the defendants had knowledge that Plexus would not receive additional defense orders. Further, plaintiff presents no facts indicating that defendants had reason to know that the additional order, which the complaint suggests was "widely anticipated" (Compl. ¶ 44), was unlikely to materialize.

The inference that plaintiff asks me to draw – that the individual defendants failed to disclose information regarding a Plexus order for the purpose of inflating the price of Plexus stock so that they could personally benefit – is less compelling than another inference. Based on plaintiff's allegations, I find more compelling the inference that defendants expected that Plexus would receive additional orders, but that their expectations were not realized. Various allegations in the complaint support this inference. (See, e.g., Compl. ¶ 69 ("In our opinion, follow-on orders have been delayed because the Joint Improvised Explosive Device Defeat Organization is still in the midst of defining the military's needs and testing multiple products. Based on our checks, JIEDDO has a budget of over $2B to spend on counter IED measures.") (quoting an analyst).) Thus, I cannot infer from defendants' failure to state that Plexus had only one defense order that defendants intentionally or recklessly deceived investors.

Plaintiff's allegations regarding the individual defendants' stock sales also do not give rise to a strong inference of scienter. Plaintiff makes much of the fact that during the class period, the individual defendants and other Plexus "insiders," sold large amounts of stock relative to the year prior to and following the class period. However, according to the complaint, the price of Plexus stock was at or near a four-year high. Further, plaintiff's allegations that defendants divested themselves of most of their Plexus shares disregards the fact that defendants also purchased stock during the class period. (See, e.g., Decl. of Brian Cothroll In Supp. of Defs.' Mot. to Dismiss, Ex. U (consisting of Plexus Corp.,

Statement of Changes in Beneficial Ownership (Form 4/A) filed by Dean Foate July 31, 2003 to Dec. 4, 2007).) In fact, defendants Bitter and Foate showed no overall decrease in stock ownership during the class period. Plaintiff does not indicate whether or to what extent the individual defendants profited from their sales of Plexus stock. Additionally, although plaintiff alleges that patterns of the sales of stock are suspicious, it does not elaborate on how the particular facts support the existence of such patterns. The complaint suggests no more than that the individual defendants sold when prices were high and did so on different days and at different prices. Without facts indicating that defendants knew or should have known that Plexus would receive no defense orders after July 2006, the allegations regarding sales of stock are insufficient to give rise to a strong inference of scienter.

Plaintiff has also failed to adequately allege scienter on the part of Plexus itself. "To establish corporate liability for a violation of Rule 10b-5 requires looking to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 708 (7th Cir. 2008) (Makor II) (internal quotations omitted). As discussed above, plaintiff has failed to adequately allege scienter on the part of the individual defendants, and the complaint gives no indication that any other Plexus officer or employee contributed to or otherwise was involved in issuing the challenged statements.

**B. Safe Harbor**

Defendants also contend that all of the statements of which plaintiff complains are protected by the safe harbor provided by 15 U.S.C. § 78u-5(c). Plaintiff disagrees, arguing

both that defendants' statements are not forward-looking, and to the extent that they are, not accompanied by adequate cautionary language.³

In its brief, plaintiff does not specifically identify any statements of defendants that it contends are not forward-looking.⁴ It merely cites paragraphs 51-53 and 57-59 of its complaint, which contain a number of statements, some of which are underscored.⁵ The statements are as follows:

Defendant Foate:

--Looking ahead to the second fiscal quarter, we currently anticipate revenues in the range of $330 million to $345 million and fully diluted earnings per share of $0.31 to $0.36, excluding any restructuring costs. Although we anticipate modest sequential revenue growth in the second fiscal quarter, <u>we are encouraged by recent new program wins, especially within the Defense/Security/Aerospace Sector, and we are increasingly confident that we can attain full-year revenue growth of 15-18%</u>.

– Our Defense, Security, and Aerospace sector was up this quarter as expected, reflecting five consecutive quarters of modest growth. Looking to the 3rd quarter, <u>we expect strong performance as we begin to ramp a significant new customer program in this increasingly important sector</u>. In support of our Defense sector strategy, we obtained compliance in our design center during the quarter.

– <u>I would say that at full run rate, this could potentially rise quite quickly to a top kind of 15 list and eventually into the top 10 list as we move through the fiscal year</u>.

---

³Defendants made the cautionary statements in press releases, conference calls and in Plexus's SEC filings that defendants referenced in the press releases and conference calls.

⁴In one sentence, plaintiff asserts that because the complaint is based on an alleged omission of material fact, defendants are ineligible for safe harbor protection. However, safe harbor applies in any action that is based on an untrue statement of a material fact or <u>omission of a material fact</u> necessary to make the statement not misleading 15 U.S.C. § 78u-5(c)(1) (emphasis added).

⁵I assume that the underscored statements are those that plaintiff contends are misleading. Plaintiff provides no other explanation for the underscoring.

– Well, I would say you would have to look at it when it's fully ramped. <u>It could be top 10, approaching a top 5 customer run rate</u>. That's as much clarity as I'd want to give out at this point.

– We currently expect revenues for the third quarter to be in the range of $390 million to $405 million, and we anticipate diluted earnings per share, before any restructuring costs and special items, to be in the range of $0.50 to $0.55, including $0.02 for stock-based compensation expense. <u>A significant new program in the Defense sector and expansion of business with existing customers in the Wireline sector are driving the anticipated sequential improvement in the third quarter</u>. We are now expecting revenue growth of approximately 20% for all of fiscal 2006, better than our earlier targeted growth rate of 15-18%.

– Our defense, security and aerospace sector was up this quarter as expected, reflecting six consecutive quarters of growth. Looking to the third quarter, <u>we currently expect exceptionally strong performance as we ramp to full production programs for a confidential customer in this increasingly important sector</u>. In addition, to the defense sector regulatory compliance achievements announced last quarter, we are working to achieve ITAR compliance at our Neenah Design Center and [COMSET] compliance in one of our Wisconsin manufacturing facilities by the fall of this year.

<u>You can anticipate we will continue to invest in the capabilities required to service the defense, security and aerospace sector as it is an important strategic initiative to deliver sticking customers into our U.S. footprint</u>.

Last, a few comments on our fiscal third quarter guidance, and the revenue outlook for the full year. For the third quarter, we are currently expecting revenue in a range of $390 million to $405 million, with EPS in the range of $0.50 to $0.55, including about $0.02 for stock-based compensation. With the exception of our wireless sector, we are currently expecting growth in all end market sectors. As outlined earlier, <u>leading the growth will be</u> in our wireline, and <u>defense, security and aerospace</u> sectors. <u>Looking to the full year, the strength of new programs won over the last few quarters,</u> coupled with <u>improved visibility for end market demand</u>, suggests that our revenue growth will approach 20% organic growth for the year, exceeding this year's target range of 15 to 18%, and last year's 18% growth rate.

Let me conclude on a confident note. We had another very good quarter, marking the mid-point of our fiscal year. Barring an unforeseen significant negative event, <u>the second half of our fiscal year should be strong as well, giving us the confidence to assert that we will exceed our targets for revenue growth and return on capital employed for the year</u>.

> – <u>We're starting to see some</u> -- as I said, we're going to see the growth rate now, is going to be pushed by the wireline sector. <u>Obviously, the defense is up dramatically</u>. <u>But we are seeing some decent strength in both of those</u>, and we're seeing some recovery back to growth again in Medical a little bit in the coming quarter, and our Industrial/Commercial sector is doing very well, also.
>
> – Well, I would say -- let me acknowledge that the defense kind of military-related business that can be different. Although it is not always different than our other business, but it can be. And in this particular case, it probably is somewhat different, in that it has -- there are fixed kind of order sizes. And then additional order quantities need to be approved further up the food chain, within the government organization. So it is not completely driven by obviously, end market appetite. It is driven somewhat by politics. But at the same time, <u>as we look into '07, we're appropriately anticipating potentially a pull back in the order quantities from this particular program</u>. But we have other opportunities that we are expecting to replace that revenue. But if order quantities continue beyond where we currently have them forecast, it is upside. As we look into '07, we're still suggesting that, as we see this program today, <u>and as we have visibilities into the orders with this current program, it should not be an impediment to us continuing to go grow 15 to 18% in the coming year</u>.
>
> Defendant Ehlers:
>
> – <u>We're going to begin significant production here in the next couple of weeks and ramping fairly significantly here at the back end of the quarter</u>.

(Compl. ¶¶ 51-53, 57-59 (emphasis in original).)

With one possible exception, I conclude that all of the above statements are within the statutory definition of forward-looking, either because they look to the future or because they contain assumptions on which the future-oriented statements are based.[6] Considering

---

[6] Plaintiff suggests that some unspecified statements are statements of present or past fact, and therefore not entitled to safe harbor protection. I see only one challenged statement that is a statement of present fact: "Obviously, the defense is up dramatically. But we are seeing some decent strength in both of those." (Compl. ¶ 59.) However, this statement is one of the assumptions underlying Plexus's projections for the next quarter, and therefore is also forward-looking. Even if the statement cannot be considered forward-looking, it is not actionable because, as plaintiff concedes, it is true. Plaintiff alleges in the complaint that defense was up 133% in fiscal 2006. (Compl. ¶ 72 n.7.) Moreover, the part of the statement regarding "decent strength" is nothing but vague puffery. See Makor I, 437 F.3d at 597 ("It is doubtful that an investor would rely on statements like 'we feel very,

the statements in their entirety, defendants are clearly discussing their outlook for the future. And viewing them individually, most of the statements are "projection[s] of revenues," discussions of the "plans and objectives of [Plexus's] management" or predictions of "future economic performance" ("Looking ahead to the second fiscal quarter, we currently anticipate revenues in the range of . . .."; "Looking to the 3rd quarter, we expect strong performance . . ..; "[Y]ou would have to look at it when it is fully ramped. It could be top 10, approaching a top 5 customer run rate."; "You can anticipate we will continue to invest in the capabilities required to service the defense,aerospace and security sector . . .."). These types of statements are prototypical forward-looking statements. The remaining statements also qualify as forward-looking because they contain "the assumptions underlying" the projections, plans and predications. ("Defense sector and expansion of business with existing customers in the Wireline sector are driving the anticipated sequential improvement in the third quarter."; "Looking to the full year, the strength of new programs won over the last few quarters, coupled with improved visibility for end market demand, suggests that our revenue growth will approach 20% organic growth for the year.").

Plaintiff asserts that the cautionary language accompanying defendants' forward-looking statements is insufficient because it does not address the possibility that Plexus would not obtain additional defense orders. (Plaintiff characterizes such language as general, boilerplate and meaningless.) I disagree. As stated, "cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(a)(i). The statute does not require

---

very good about the robust growth we're experiencing,' or 'demand for our core optical products . . . remains strong.'").

prescience concerning possible risks; that is, cautionary language does not have to identify the particular risk that actually materializes. Asher, 377 F.3d at 730.[7] However, even if it did, in the present case, defendants' cautionary language addresses the risk that plaintiff claims defendants ignored – i.e., that because it had not obtained a long-term commitment from its Defense sector customer, Plexus might not obtain enough defense orders to meet its revenue projections. In its SEC filings, Plexus specifically warns that it could not accurately project or predict future performance because in its business customers do not typically make long-term commitments. Plexus further states that in its business orders are generally short-term and that customers delay, cancel, and discontinue them without warning. See, e.g., Plexus Corp., Annual Report (Form 10-K), at 25 (Dec. 5, 2005). Thus, defendants' cautionary language speaks directly or nearly directly to the omission that plaintiff contends makes defendants' statements misleading: that Plexus had only one current defense order and no long-term commitment. See Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999) ("[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment

---

[7]Plaintiff's reliance on Asher to support its argument that I may not resolve a safe harbor defense on a Rule 12(b)(6) motion is also unavailing. In Asher, the Seventh Circuit remanded the case to the district court for a determination as to whether the cautionary language was "meaningful," that is, whether it addressed the potential major, important risks faced by the defendant company's business. However, the Asher Court did not state or imply that a safe harbor defense could never be resolved on a motion to dismiss; the decision to remand was based on the nature of the record in the case. 377 F.3d at 734. The record in the present case is different: the cautionary language identifies and discusses the risk at issue – future order placement; additionally, defendants' cautionary language is not static, but changes over time to reflect new risks and problems Plexus encounters. Cf. id.. Compare Plexus Corp., Quarterly Report (Form 10-Q), at 30 (Feb. 9, 2006) with Plexus Corp., Quarterly Report (Form 10-Q), at 31 (May 9, 2006) (discussion under subheading "We and our customers are subject to extensive government regulations"). Moreover, the statute expressly authorizes courts to resolve a safe harbor issue on a motion to dismiss. See 15 U.S.C. § 78u-5(e).

to make an intelligent decision about it according to her own preferences for risk and reward.").

Plaintiff seems to contend that the cautionary language is inadequate because defendants inaccurately suggest that Plexus had a commitment for multiple defense orders. However, defendants do not state or imply that Plexus had such a commitment. Plaintiff points to defendants' statements that "as we look into '07, we're appropriately anticipating potentially a pull back in the order quantities from this particular program . . . . But if order quantities continue where we currently have them forecast, it is upside" and "as we have visibilities into the orders with this current program . . . ." (Pl.'s Br. at 11-12.) However, these statements are not misrepresentations. Plaintiff points to defendants' use of the plural, e.g, "order quantities," "visibilities into the orders," but defendants' statements can only be read as expressions of defendants' hopes and expectations and not as misstatements concerning the current state of Plexus's defense business.

Thus, defendants' cautionary language stating that most of Plexus's orders are short term and subject to change or discontinuation at the customer's will is sufficient. In addition, such language is not generic or boilerplate but specific to the risks inherent in the industry of which Plexus is a part as well as to the risks involved in Plexus's particular lines of business. For example, Plexus's warnings about the uncertainty of customer orders mention that companies in Plexus's industry do not generally obtain long-term customer commitments. See, e.g., Plexus Corp., Quarterly Report (Form 10-Q), at 27 (Feb. 9, 2006). They further mention that Plexus depends on a small number of customers and could suffer significant reductions in sales if one of its customers discontinued its orders. Id. at 26. In fact, defendants' warnings describe an incident involving Plexus's loss of a major customer. Id. Defendants also mention the risks inherent in defense contracting,

such as, for example, that the placement of orders is influenced by politics and other factors unique to government procurement. (See, e.g., Plexus Corp., Quarterly Report (Form 10-Q), at 31 (May 9, 2006); Compl. ¶ 59.) And, as discussed above, the cautionary language contained in Plexus's SEC filings is not static. Rather, it changes as Plexus faces new risks. For these reasons also, defendants' cautionary statements are not boilerplate or generic but, rather, tailored to the risks involved in Plexus's business. See, e.g., Asher, 377 F.3d at 733 (noting that company-specific warnings are not boilerplate); Harris, 182 F.3d at 807 (11th Cir. 1999) (rejecting the argument that the cautionary language was boilerplate).

For the foregoing reasons, all of the statements of which plaintiff complains are entitled to safe harbor protection.

## IV. CONCLUSION

Therefore,

**IT IS ORDERED** that defendants' motion to dismiss is **GRANTED**. Although I have considerable doubt whether plaintiff could cure the pleading problems I have identified, I will grant plaintiff until March 30, 2009 to file an amended complaint if it chooses to.

Dated at Milwaukee, Wisconsin this 6 day of March, 2009.

        /s  
        LYNN ADELMAN  
        District Judge